**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**

**vs.**                                          **CAUSE No.: 3:14-CR-111-HTW-FKB**

**CHRISTOPHER B. EPPS**

---

**ORDER**

---

BEFORE THIS COURT is Defendant Christopher B. Epps's ("Epps") Motion for Compassionate Release [Docket No. 124] and the United States Government's Response in Opposition [Docket No. 130]. Epps seeks a sentence reduction under Title 18, U.S.C. § 3582(c)(1)(A)(i)[1], asking this Court to release him from the custody of the Federal Correctional Institution (FCI) in Seagoville, Texas and permit him to serve the remainder of his sentence on home confinement. The Government concedes that Epps properly has exhausted his administrative remedies within the Federal Bureau of Prisons (BOP), rendering the matter ripe for review on the merits. This Court, having reviewed the pleadings, the record, the applicable Fifth Circuit and United States Supreme Court jurisprudence, and the governing statutory authority, finds that the Defendant's motion is not well-taken and must be denied for the reasons following.

---

[1] 18 U.S.C. § 3582(c)(1)(A)(i) provides that "the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment... if it finds that--(i) extraordinary and compelling reasons warrant such a reduction".

# I.   JURISDICTION

This court exercises proper subject-matter jurisdiction over the instant post-conviction motion pursuant to Title 18 U.S.C. § 3231[2]. This statutory grant vests federal district courts with original and exclusive jurisdiction over all offenses against the laws of the United States. Furthermore, Title 18 U.S.C. § 3582(c)(1)(A)[3] directly empowers this sentencing court to modify an imposed term of imprisonment upon a properly filed motion after the defendant satisfies the mandatory administrative exhaustion requirements

# II.   BACKGROUND

## A.  Factual Background

On February 25, 2015,  Epps entered a plea of guilty to the crime of conspiracy to knowingly conduct financial transactions affecting interstate commerce in violation of Title 18 U.S.C. § 1956(h)[4], and  the filing of a fraudulent tax return in violation of Title 26, U.S.C. § 7206(2)[5].

---

[2] Title 18 U.S.C. § 3231 provides: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."

[3] Title 18 U.S.C. § 3582(c)(1)(A) defines the statutory authority of a sentencing court to modify an imposed term of imprisonment, stating that the court "may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights... may reduce the term of imprisonment... if it finds that—extraordinary and compelling reasons warrant such a reduction."

[4] Title 18 U.S.C. § 1956(h) provides that "Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

[5] Title 26 U.S.C. § 7206(2) establishes criminal penalties for any person who "[w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document."

Epps's convictions arose from a massive, multi-year public corruption scheme orchestrated during his tenure as the Commissioner of the Mississippi Department of Corrections (MDOC). The federal investigation disclosed that from 2008 through June 2014, Epps exploited his high-ranking governmental office by demanding and accepting nearly $1,400,000 in clandestine bribes and kickbacks from contractors in exchange for approving hundreds of millions of dollars in lucrative MDOC state correctional contracts. Epps personally enriched himself while subverting the integrity of the state's procurement process, and he compounded his criminal conduct by failing to report these illicit kickbacks on his federal tax returns, generating a direct tax loss of $227,000 to the United States Government.

Even after coming under federal indictment and entering his guilty plea, Epps demonstrated a profound disrespect for judicial authority and the rule of law. Epps actively violated the explicit terms and conditions of his pretrial release by breaking into his former home, which he had already forfeited to the federal government as part of his plea bargain, supposedly to remove light fixtures and other items from the home[6]. This unauthorized entry and theft resulted in a new burglary charge, directly precipitating the revocation of his pretrial release on November 1, 2016, and this Court's imprisoning Epps to await sentencing.

On May 24, 2017, this Court sentenced an imprisoned Epps to a cumulative total term of 235 months of imprisonment, to be followed by a cumulative total of three years of supervised release. This Court also imposed a $100,000 fine.

Epps is currently housed at FCI Seagoville in Seagoville, Texas, with an anticipated release date of July 12, 2033. At the time he filed the motion sub judice, he had served approximately 63

---

[6] When the new owner inspected the house the next day, he concluded that items were missing – the landscaping light system transformer; four (4) small landscaping lights; and one (1) large landscaping light. *See* Doc. 101.

months[7] of his sentence, including credit for good conduct time[8]. Additionally, the State of Mississippi lodged a detainer against Epps on February 28, 2018, requiring after the completion of his federal sentence for him  to serve a 25-year state sentence concurrent with his federal custody.

### B.  Procedural History

On January 30, 2021, Epps submitted an administrative request for compassionate release to the Warden of FCI Seagoville, citing concerns regarding: COVID-19; his prior hospitalization for COVID-19; hypertension;  hypolipidemia; cardiac issues; and respiratory damage. The Warden denied that request on February 26, 2021.

On May 28, 2021, Epps filed the instant Motion for Compassionate Release. Epps asserts that his underlying medical conditions—specifically hyperlipidemia, hypertension, unspecified glaucoma, enlarged prostate, and gout—combined with the ongoing risks of the COVID-19 pandemic-present extraordinary and compelling reasons warranting a sentence reduction to home confinement. The Government filed its Response in Opposition on June 17, 2021, and Epps filed a Reply on June 18, 2021.

### III.    LEGAL STANDARD

The compassionate release statute is codified at Title 18 U.S.C. § 3582(c)(1)(A)[9], as amended by the First Step Act of 2018. Under this statute, an incarcerated individual may petition

---

[7] According to the Government, at the time of his filing the instant motion, Epps had served approximately 63 months of his federal sentence.

[8] Although Epps, at his supervised release revocation hearing, said that the retrieval of Christmas lights was his motive for his break-in, neither the general public, nor this court accepted this explanation, given the value of the Christmas lights and the possible punishment he would face upon apprehension at the scene. As it was, Epps was spotted breaking in by a neighbor, who reported him to the police.

[9] Title 18 U.S.C. § 3582(c)(1)(A) sets forth the statutory mechanisms allowing federal inmates to seek modifications of final, structured terms of imprisonment following institutional remedy exhaustion.

the court directly for a sentence reduction but  only after he has fully exhausted administrative remedies with the Bureau of Prisons ("BOP"), or after the lapse of 30 days from the receipt of such a request by the Warden of the facility, whichever occurs earlier *See United States v. Chambliss*, 948 F.3d 691, 692–93 (5th Cir. 2020).

Once this threshold is cleared, the Court may reduce a term of imprisonment, after considering the factors set forth in Title 18 U.S.C. § 3553(a)[10] if the Court finds that:

1. "extraordinary and compelling reasons warrant such a reduction;" and

2. "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

The movant bears the burden of proving that extraordinary and compelling reasons justify relief. *See United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022). Notably, Congress explicitly has stated that the rehabilitation of a defendant alone shall never be considered an "extraordinary and compelling reason" to warrant a sentence modification. *See*  Title 28 U.S.C. § 994(t)[11].

## IV.    DISCUSSION

### A.  The Compassionate Release Statute

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

---

[10] Title 18 U.S.C. § 3553(a) commands federal sentencing courts to consider specific statutory variables, stating that "the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," including the nature of the offense, the history of the defendant, the need for deterrence, and the protection of the public.

[11] Title 28 U.S.C. § 994(t) details the statutory mandate issued by Congress to the United States Sentencing Commission, directing that "the Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

(1) in any case—

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A)  Medical Condition of the Defendant.—

    (i)      The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)      (ii) The defendant is—

        (I) suffering from a serious physical or medical condition,

        (II) suffering from a serious functional or cognitive impairment, or

        (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

(B)  Age of the Defendant.—The defendant

    (i)      is at least 65 years old;

    (ii)      is experiencing a serious deterioration in physical or mental health because of the aging process; and

    (iii)      (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)  Family Circumstances.—

    (i)      The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)  Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g., United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020)

(Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

### B.   Characteristics of the Defendant

On January 30, 2021, the defendant submitted a request for compassionate release to the Warden. ECF Doc. No. 124-2. The request was based on the defendant's prior hospitalization in Intensive Care due to complications from COVID-19, as well as the following identified medical conditions: hypertension, hypolipodemia,1 cardiac issues, and also damage and injury to the defendant's respiratory system during his COVID-19 infection. The defendant does not expressly identify the specifics of the alleged cardiac issues, nor does he explain the alleged damage or injury to his respiratory system resulting from his earlier COVID-19 infection. On February 26, 2021, the Warden denied this request.

On May 28, 2021, the defendant, through counsel, submitted a motion to this Court for compassionate release. The defendant asserted an array of health issues, namely hyperlipidermia, hypertension, unspecified glaucoma, enlarged prostate, and gout, as well as the fact that the defendant already has suffered from a confirmed case of COVID-19. ECF Doc. No. 124, at 2.

To address the defendant's motion for compassionate release, the Government obtained the defendant's medical records from the BOP, from 2019 to 2021, copies of which are filed under seal on the record. The medical records reveal that the defendant, who i60 years old, presents essential (primary) hypertension, hyperlipidemia, enlarged prostrate without lower urinary tract symptoms, gastroesophageal reflux disease without esophagitis, gout, and unspecified glaucoma. In his most recent medical records, the defendant's lungs are described as "clear to auscultation bilaterally" with "[n]o chest wall tenderness, rales, rhonchi, or wheezing." The defendant's heart

is described as "[r]egular rate, rhythm, [n]ormal S1[12], S1, [n]o gallops, murmurs, clicks." All of the defendant's conditions appear well-controlled at this time with medication provided by the institution.

As mentioned previously, this defendant pled guilty to conspiracy to knowingly conduct financial transactions affecting interstate commerce in violation of Title 18 U.S.C. § 1956(h), and to the filing of a fraudulent tax return in violation of Title 26, U.S.C. § 7206(2). This Court sentenced him to a cumulative total term of 235 months of imprisonment, to be followed by a cumulative total of three years of supervised release. This Court also imposed a $100,000 fine. At the time of filing of his motion for compassionate release, the defendant had served only 63 months toward his 235-month sentence, for a serious violation of the public's trust.

**C. FCI Seagoville**

The defendant herein is confined in FCI Seagoville, Texas. As of June 10, 2021, that institution housed 1763 inmates. See https://www.bop.gov/locations/institutions/sea/.  At the time of filing of defendant's request for compassionate release, only (2) inmates were reported positive. They were isolated while they were treated/recovering. Further, at the time during which this defendant filed his motion, 1142 current inmates had previously tested positive, but had recovered; Five (5) COVID related deaths were reported at that institution. Those statistics are available at www.bop.gov/coronavirus.

1. Vaccinations

BOP was working with the Centers for Disease Control and Prevention (CDC) and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation

---

[12] "S1" denotes the first heart sound, created by closure of the mitral and tricuspid valves at the beginning of systole. A finding of "normal S1" is a routine physical examination finding indicating a normal first heart sound.

Warp Speed) to ensure that BOP received the COVID-19 vaccine as it became available. As of the week of February 8, 2021, doses of the vaccine were delivered to every BOP institution.

According to the Government, BOP offered the vaccine first to full-time staff because staff members—who come and go between the facility and the community—present a more likely vector for COVID-19 transmission into an institution. Vaccines were administered to all willing staff members. BOP, says the Government, continued to encourage staff members who had not accepted a vaccine to do so.

Additionally, says the Government, BOP at the time of this motion's filing, offered vaccines to inmates, and proceeded on a priority basis of need in accordance with CDC guidelines, that is having offered the vaccine first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who presented a condition identified by the CDC as evidencing a risk of severe COVID-19 disease; and then to all inmates. As of June 10, 2021, adds the Government, BOP administered a total of 191,324 doses to staff and inmates nationwide. As of mid-April 2021, BOP estimated that if it received doses at the then-current pace, it would be able to offer a vaccine to every inmate in its custody by June 1, 2021. This Court accepts these unchallenged statistics.

At FCI Seagoville, where the defendant is held, BOP had fully vaccinated 174 staff members, and 1291 inmates (which was approximately 73% of the current inmate population and did not account for those additional inmates who declined vaccination). Information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

### D. Covid-19 and the Defendant

On or about December 16, 2020, BOP administered to the defendant the first dose of the COVID-19 vaccine produced by Pfizer. The second dose was administered on or about January 4, 2021. Therefore, the BOP has administered to the defendant both doses of the COVID-19 vaccine produced by Pfizer.

The defendant did contract Covid-19 but, fortunately, seemingly recovered from it without reported significant consequences.

### E. Authority Over Home Confinement

Epps requests that this Court order his release to home confinement for the remainder of his sentence. This Court, however, lacks the legal authority to grant a transfer to home confinement. The authority to place a prisoner in home confinement rests solely with the Attorney General and the Bureau of Prisons, as enunciated by Title 18 U.S.C. § 3621(b)[13] and § 12003(b)(2)[14] of the Coronavirus Aid, Relief, and Economic Security (CARES) Act. *See United States v. Miller*, 404 F. Supp. 3d 729, 733 (W.D.N.Y. 2019). *see also, e.g.*, *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS

---

[13] Title 18 U.S.C. § 3621(b) dictates that "The Bureau of Prisons shall designate the place of the prisoner's imprisonment," and outlines the specific factors the Bureau considers in designating or transferring an inmate.

[14] Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act grants the Director of the Federal Bureau of Prisons (BOP) the authority drastically to expand home confinement for federal inmates. Specifically, it allows the BOP to bypass pre-existing time limits—which restricted home confinement to the shorter of 6 months or 10% of a sentence—and lengthen the maximum amount of time an inmate can serve on home confinement.

66269, at *1 (E.D. Tenn. Apr. 15, 2020)("the CARES Act [puts placement] authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

This Court's authority under § 3582(c)(1)(A), thus, is strictly limited to modifying an imposed term of imprisonment to a sentence of time served, not dictating the placement of an inmate, or ordering home confinement. Accordingly, the Court evaluates Epps's motion solely as a request for a sentence reduction under the compassionate release statute.

## F.  Extraordinary and Compelling Reasons Analysis

Epps contends that his medical profile—specifically hypertension, hyperlipidemia, and prior contraction of COVID-19—combined with the generalized dangers of the pandemic, establish "extraordinary and compelling reasons" for his release. This Court disagrees.

The mere existence of COVID-19 in society and the generalized possibility that it may spread within a correctional facility cannot independently justify compassionate release. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The United States Court of Appeals for the Third Circuit in *Raia* held that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Id.* at 597. *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own."); *United States v. Buchanan*, No. 1:18-CR-21-HAB, 2020 WL 3790589, at *1 (N.D. Ind. July 7, 2020) (denying compassionate release despite 360 active cases of COVID-19 at prison); *see also United States v. Collins,* No. 14-CR-30038, 2020 WL 2301217, at *2 (C.D. Ill. May 8, 2020) ("[T]he COVID-19 pandemic does not

warrant the release of every federal prisoner with health conditions that makes him more susceptible to the disease.").

Further, the United States Court of Appeals for the Fifth Circuit has held that commonplace conditions like hypertension and hyperlipidemia, which affect vast portions of the American population, do not present extraordinary and compelling circumstances under the statute. *United States v. Thompson*, 984 F.3d 431, 434 (5th Cir. 2021); rather, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii).

Epps's medical records establish that his medical conditions are well-controlled by the BOP. Epps's lungs are clear, and his vital signs and chronic conditions are actively managed by institutional medical staff. Crucially, the record establishes that Epps has received both doses of the Pfizer COVID-19 vaccine.

The Fifth Circuit and numerous other federal courts, cited below, recognize that full vaccination against COVID-19 dramatically mitigates the risks of severe illness or death, thereby precluding a finding that a vaccinated inmate's susceptibility to the virus constitutes an extraordinary and compelling reason for release. *See e.g. United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("[F]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release."); *United States v. Baeza-Vargas*, 532 F. Supp. 3d 840, 843–46 (D. Ariz. 2021) (holding that vaccination against COVID-19 weighs heavily against a finding of extraordinary and compelling medical reasons); *United States v. Wills*, 2021 WL 2179256, at *1 (D. Or. May 27,

2021) (Brown, J.) (citing many cases); *United States v. Otero-Montalvo,* 2021 WL 1945764, at *3 (E.D. Pa. May 14, 2021)(Schmehl, J.) (41-year-old defendant presented asthma and obesity, but since he had been vaccinated; the court dismissed his complaints regarding prison management, stating, "The BOP and FCI Fort Dix administering vaccinations shows that they are taking the appropriate precautions to the COVID-19 pandemic and are safeguarding inmates."); *United States v. Harris,* 2021 WL 1516012, at *2 (D. Md. Apr. 16, 2021) (Gallagher, J.) ("Clearly, there can be no bright-line rule that a vaccinated individual is no longer at compellingly elevated risk, but in most instances, the risk of complications is dramatically reduced; thus, while anything is possible, there is no articulable reason to believe that [defendant] will be a non-responder or will have a different reaction to the vaccine than the vast majority of its recipients, who develop significant antibody protection to the virus. On the present record, then, this Court concludes that [defendant's] vaccination status removes his borderline obesity from the category of risk constituting an "extraordinary and compelling reason" to consider compassionate release."); *United States v. Session,* 2021 WL 2195505 (W.D.N.Y. June 1, 2021) (Larimer, J.) ("The fact that [defendant] has contracted the virus without significant impact and in light of the fact that he has been vaccinated, his risk of further infection seems quite minimal."); *United States v. Dixon,* 2021 WL 2315193, at *2 (N.D. Ohio June 7, 2021) (Adams, J.) (in light of the sharply declining positive rate in BOP facilities and the number of vaccinations, "the Court can no longer find that the COVID-19 pandemic can be relied upon to demonstrate extraordinary and compelling reasons.").

Epps's vaccination status provides him with substantial self-care protection against the virus, rendering his generalized fear of reinfection or severe complications entirely speculative. Furthermore, courts routinely deny relief where an inmate, such as Epps, has previously recovered from COVID-19 and received vaccination, as the combination of natural antibodies and vaccine

protection removes the foundation for extraordinary circumstances. *See e.g. United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021); *United States v. Haines*, 2021 WL 2255898, at *2 (E.D. Pa. June 3, 2021).

Since Epps filed his motion for compassionate release, various courts have viewed COVID-19 in different lenses. This Court has accepted and has been influenced by the jurisprudence in effect during the time of Epps's motion before this Court. No party to the litigation *sub judice* has submitted, or even attempted to submit, a supplement to the Court on the issues pertaining to COVID-19. Epps is free to submit data/research which allegedly refutes the medical, scientific findings, or the COVID-19 statistics reported for FCI Seagoville upon which this Court has relied in this Opinion as a basis for its determination.

### G.  Section 3553(a) Sentencing Factors

Even assuming arguendo that Epps had presented an acceptable "extraordinary and compelling reason", any sentence reduction would remain entirely inappropriate upon comprehensive evaluation of the sentencing factors set forth in § 3553(a), which require this court to consider, *inter alia*, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence.

A dispassionate examination of the magnitude of Epps's criminal conduct reveals a staggering betrayal of the public trust. Epps was not a low-level offender motivated by a momentary lapse of judgment; neither was he a "temporary" offender who quit his criminal escapade after only a few times during which he dipped a greedy hand into the pool of crime. Further, he did not plan, commit, execute his crime as a "lone wolf", acting stealthily, but by himself; rather, he was the central architect and principal beneficiary of one of the most egregious,

sweeping, and destructive public official corruption scandals in modern Mississippi history. Operating from his top-ranking position as the Commissioner of the MDOC[15], Epps systematically unlawfully weaponized[16], utilized and stretched his governmental authority for personal gain. Between 2008 and June 2014, Epps orchestrated a corrupt enterprise wherein he demanded and accepted nearly $1,400,000 in clandestine bribes and kickbacks. In exchange for these illicit payoffs, Epps personally illegally approved hundreds of millions of dollars in lucrative state correctional contracts, subverting the competitive bidding process, defrauding the citizens of Mississippi, and injecting lethal poison into the corpus of a trusting, vulnerable administrative process of the state's penal system.

The collateral consequences of Epps's greed extended far beyond administrative malfeasance. By corruptly steering public funds and contracts to favored vendors in exchange for kickbacks, Epps degraded the constitutional and statutory responsibilities entrusted to his office; inflicted a direct tax loss to the United States of $227,000 upon the federal government by failing to report his ill-gotten gains; and demonstrated an astonishing contempt for the rule of law[17].

---

[15]Epps began his career with the MDOC in 1982 as a correctional officer at the Mississippi State Penitentiary at Parchman. He subsequently served in various positions within MDOC, including disciplinary hearing officer/investigator, case manager, case management supervisor, deputy superintendent at Parchman, chief of staff, deputy commissioner of institutions, and deputy commissioner of community corrections, before being appointed Commissioner of MDOC in 2002. *See* Miss. Dep't of Corr., *2008 Annual Report*; Miss. Dep't of Corr., *2014 Annual Report*.

As the Commissioner, Epps served as the Department's chief executive, administrative, and fiscal officer and possessed broad statutory authority over the administration and operation of the State's correctional system, including the supervision of correctional institutions, inmate classification and housing, personnel, budgeting, departmental policies, correctional programs, and coordination with other governmental entities. Correctional systems under his supervision included: the Mississippi State Penitentiary; Central Mississippi Correctional Facility; South Mississippi Correctional Institution; East Mississippi Correctional Facility; Wilkinson County Correctional Facility; and other MDOC-operated and contracted correctional facilities. *See* Miss. Code Ann. §§ 47-5-20, 47-5-24, 47-5-26, 47-5-2.

[16] On occasion he would threaten financially his dependent co-conspirators.

[17] On a wiretap, Epps is heard to brag that his control of the Mississippi Legislature was so complete that he was sure to obtain whatever he requested from that body of lawmakers. *See* S. Con. Res. 552, 2013 Leg., Reg. Sess. (Miss. 2013) (commending Christopher B. Epps for his service to the Mississippi Department of Corrections and

Furthermore, Epps's flagrant disregard for legal authority did not cease upon the termination of his scheme; even after coming under federal indictment, Epps violated the explicit conditions of his pretrial release, necessitating his remand into custody.

Epps now asks this court to truncate his 235-month sentence—having served at the time of filing his motion approximately 63 months[18], according to the Government,—to leave the vast majority of his judicially-mandated punishment unserved. Releasing Epps prematurely would make a mockery of the statutory sentencing purposes. Such leniency would fail to reflect the true gravity of public corruption, would actively diminish respect for the law, and would fail to provide just punishment for an offense that shook to the core public confidence in Mississippi's penological system. Epps's criminal conduct was truly epic.

The United States Court of Appeals for the Third Circuit, addressing a public corruption prosecution, affirmed that the nature and circumstances of corruption offenses and the limited fraction of the sentence actually served in that case heavily outweighed generalized health concerns under the § 3553(a) calculus. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (affirming the denial of compassionate release for a public corruption defendant after serving only 19 months of a 180-month term, emphasizing that the time remaining to be served is a heavily weighted factor that counsels strongly against early release).

Permitting Epps to escape the remainder of his lawfully-imposed custodial sentence would also create unwarranted sentencing disparities among defendants convicted of other, large-scale white-collar crimes by convicts, whose criminal activities fall far short of Epps's unprecedented criminal denotation as "master criminal".

---

noting that he began his career as a correctional officer and advanced through numerous positions within the Department before becoming Commissioner).

[18] This Court notes that credit for time served, and to be served, is calculated by the BOP.

Accordingly, this Court concludes, as it must, that the sentencing factors codified in Title U.S.C § 3553(a), for Epps's request *sub judice*, erect an insurmountable barrier to the relief Epps seeks.

## V.    CONCLUSION

The Court, as always, sympathizes with the health concerns inherent in any incarceration during a public health crisis; however, the law requires strict adherence to statutory parameters. Epps has failed to establish extraordinary and compelling reasons under Title 18 U.S.C. § 3582(c)(1)(A)(i), and the applicable Section 3553(a) factors weigh ponderously against any sentence reduction.

Further, this Court analyzed Epps's motion for compassionate release as a plea for relief, owing to his apprehension that, because of his various medical ailments, he would be vulnerable to grave sickness or death.

These underlying ailments—hyperlipidermia, hypertension, unspecified glaucoma, enlarged prostate, and gout—were not argued in a context separate from COVID-19 though; Epps submitted no real argument that any of these alleged ailments, standing alone, met the strictures of the Compassionate Release jurisprudence. If Epps has such an argument, he is free to submit same. Similarly, as this Court pronounced earlier in this Order, if Epps can show that new authority completely undermines the law relied upon by this Court, he may file a new motion for Compassionate Release.

**IT IS, THEREFORE, ORDERED** that **Defendant Christopher B. Epps's Motion for Compassionate Release** [Docket No. 124] is hereby **DENIED**.

**SO ORDERED this the  29th  day of        July      , 2026.**

> /s/HENRY T. WINGATE
> **UNITED STATES DISTRICT COURT JUDGE**